The United States Court of Appeals for the Federal Assertion is now open in the session. God save the United States and the Honorable Court. Thank you. Be seated. Good morning, everyone. We're hearing an argument on motions this morning. Case number 15, 1139, Takeda Pharmaceuticals, USA, against Hikma Americas, Incorporated. Mr. Weinberger. May it please the Court. This is not a typical off-label or carve-out case, which this Court has considered on a number of occasions. Congress clearly commented in the carve-out legislation that there would be situations in which the generic would be selling a drug for one method of use, but at the same time there might be off-label uses for that, which were covered by a patent. Correct? Absolutely correct, Your Honor, and that's why I started the way I have, to try and show that this case is not the kind of case that Your Honor is referring to. Well, it seems to me to follow from that that the mere fact that there are off-label uses prescribed does not result in inducement. You would agree with that? I do agree with that. I think the key difference is that in those cases, the label, as well as the application, was silent with respect to any off-label use. There was nothing in the AstraZeneca 2012 case, the Court found that the label expressly and indisputably carved out all non-approved uses. Well, what should the label, in your view, have said here to avoid the inducement problem that you say exists? Taking both sets of patents separately, with respect to the acute flares, the label clearly should have said, do not use Mitigare for treatment of acute flares. But having said, consult your doctor, they're basically saying it can be used if your doctor says it can be used. And the doctor knows how to prescribe it, knows how to instruct it, because the dosing regimen and the patents are the only approved dosing regimens that are available. Well, didn't the label come close to that in saying that this hadn't been approved only for prophylactic use? No, actually what it said was that it hadn't been studied for acute gout flares. It did not say anything about not using it. And let me direct the Court to one item in the record that could help on this. At 82578, the FDA, during the application process, told Tecmo, I think it was Westward at the time, told them, your label could clearly state, don't use Mitigare for treatment of acute gout flares. And then we wouldn't be here. But they resisted. They didn't want to do that. They said, well, you know, we think there's literature that supports what we're saying, and we want to be able to say consult your doctor, and the FDA went along with that. So they made a choice, Tecmo. They made a choice to have a watered-down statement, not a clear disclaimer, not a clear statement that it couldn't be used, but an instruction that if a patient, while taking Mitigare for treatment, suffers a flare, then he should consult the doctor. And the doctor, the key thing here to understand is that he's- I think that's the wrong standard, that they have to have a clear disclaimer to avoid inducement. It's the other way around. There has to be a statement in the label that constitutes an inducement. And I'm having trouble seeing what it is in this label that constitutes an inducement for a patent abuse. You have the statement that this isn't studied for anything other than prophylaxis, and that you should consult your doctor. How does that suggest to anybody that it should be used for a patented use? I think in the context of this product and what is known by the providers and the participants in the industry, it is an instruction. Because I think unlike these other off-label cases, these two indications are inextricably related. When a patient goes on prophylactics, he's already had gout flares. You don't put someone on prophylactics, a potentially toxic drug, unless there's a reason for it. And the reason is that they've had acute gout flares that haven't been controllable. So they go on prophylactics, and as the ACR of the Rheumatology College noted, and the site for this is at 394 and 389, once you go on prophylactics, you will have gout flares. Usually in the first six to eight months, you're going to have gout flares. And that means that that patient is going to call his... How often does that happen? Why? How often does it happen? It happens six to eight times in the first six months is what the study shows. And obviously it's different for each patient, but it happens a substantial number of times. And I can give the report a site for that. At 8394, the American College said, Importantly, recent clinical trials have shown substantial rates of acute gout attacks in the first six or eight months after initiation of prophylactics, even where you're being treated with colchicine. So this is going to happen. It's inevitable. But this stuff you're pointing us to is all stuff that's not in the label. This is all knowledge of how these gout flares might work, what their alternative courses of treatment are. What particular language in the label are you suggesting induces infringement? Is it just contact your doctor? Well, I think that it's kind of a wink and nod situation where you don't want to lay out the specifics. So you say, if you have an acute flare, which they know you're going to have, then contact your doctor. In this situation, the FDA has recommended... If the label didn't have that language, if you have an acute flare, contact your doctor, would there be any question of inducement? No. And that's the distinction that I'm... So you agree that we can't get to all this outside evidence of protocols and things like that for treating acute gout flares with Mitigare without the contact your doctor language? Yes. I think that the point here is that the label is what contains the implicit instruction. And then to understand what that instruction means and how it's going to be interpreted by those who are getting it and what it tells you about the intent of the defendant, then you have to look at all of the context to see what is understood, what is known, et cetera. And when you do that, you realize that a doctor is going to get a call from a patient who's suffering an acute flare while he's being treated with 0.6 Colchicine. And immediacy of treatment of these flares, as FDA has said, is critical. You need to treat them right away. And a substantial number of doctors are going to say, well, the Colchicine is sitting in your medicine cabinet. Take it, and it's going to relieve your gout flares. And take it, there's only one way to take it for gout flares. The FDA has laid that out. The ACR has laid that out. So inevitably, the instruction to consult your doctor for someone who's on prophylactics and is going to suffer an acute gout flare is going to be to take the Colchicine in accordance with the patented dosing regime. So if that were true in 100% of the cases, and you had proven that, and the district court had made a factual finding or had made it clearly erroneous factual finding as the contrary, and to your point, but isn't the problem here that there's no definitive proof that that would be the automatic or nearly automatic result here, that there's evidence that there could be other non-infringing avenues to consult your doctor phrase? Yes, let me address that, Your Honor. I think that as the AstraZeneca 2010 case made clear, the fact that not all doctors or patients would infringe, that only some would infringe, does not prevent a finding of active inducement. And I think the other point is that the existence of a substantial non-infringing use does not relieve a defendant from active inducement if there's other evidence of intent to... because the label there didn't have this kind of generic consult your doctor phrase. It had more specific instructions that, if you followed through the logic and the protocols, would essentially result in infringement in almost every case. And I don't think that's... and like I said, if that was the argument you were making and there were evidence in the record here, it seems like it would fall more explicitly within AstraZeneca. But it seems... I thought that the district court had found that there were substantial non-infringing uses of this. And that seems to me to be kind of, at least in some ways, a factual question that you have a pretty hard hill to get over. Well, in AstraZeneca, actually, the court, the federal circuit, this court, made no finding of substantial non-infringing use. There was a lot of confusion and controversy at the district court about how much the infringing use was and how much it wasn't. And there was no specific finding. But certainly, the court said that you could have infringement even with a substantial non-infringing use. But the substantial infringing use, if there is one, is under the legislation simply not relevant to the issue of inducing it. Because Congress wanted people to carve out and sell it for other things, even though, as you admitted, there is a risk that some doctors will prescribe it for off-label uses. So the question is here, by saying consult your doctor, what does that mean? I thought the record was pretty clear that there are a lot of other treatments for acute gout flare-ups that don't even involve this drug. And, of course, there's the possibility that the doctor would prescribe your own client's product for that purpose, right? I mean, it doesn't automatically follow consult your doctor that he's going to tell you to continue to take a different dose of the generic, right? It doesn't automatically follow. But remember that these alternatives that your Honor is referring to exist for prophylaxis as well, the same alternatives, the NSAIDs, the corticosteroids, and the colchicine. So we're dealing now with a doctor who's already decided to put his patient on the colchicine, and then he substituted the Mitagir for my client's product, for Colchris. And then he's now faced with a patient who says, I have an acute flare while I'm on it. So the likelihood that he's going to tell him to go get some different drug, having already selected this drug for the prophylactics we submit is low. It's not a very likely scenario. What is the evidence of that? Well, the evidence of that is, as I mentioned, acute flares will come, that they're going to have them, that the colchicine is one of the primary modalities that is recommended. Is there any evidence, survey of doctors, or what they've done? How do we know about that? Well, we know that we put in evidence of a survey that showed that about 56% of Colchris prescriptions were for acute gout flares. So the majority of uses for the product that this is being substituted for were for acute gout flares. Wait, but that's different than someone who's taking it for prophylaxis and then has an acute gout flare. It may be that there are prescriptions for this drug for the patented use, but as we've talked about before, the fact that that happens is irrelevant to inducement. What you have to address yourself to is a situation where somebody's taking it for prophylaxis, there's an acute flare-up, and then consults the doctor, and the doctor says, well, take a different dose of the generic that you're already taking. We don't know how often that happens, right? We don't know exactly how it happens, but we do know that colchicine is used on a widespread basis and has been for years to treat acute gout flares. We do know that a majority of the prescriptions of Colchris are written for acute gout flares. But that's irrelevant. That's the wrong question. The question is, to what extent are doctors telling people to have acute gout flares during prophylaxis to take a different dose of the generic that they're already taking? Well, we don't have a survey, but there's certainly evidence in the record from the expert witnesses we put in that that is the practice. Dr. Morton said that, Dr. Blumershine said that, and that's basically what they said, that if they have patients who are on prophylactics using colchicine and they get acute gout flares, they're going to tell them to use the medicine that they have in their cabinet that's FDA approved, that is recommended by one of the primary recommendations. Two doctors? Sorry? Two doctors? Two doctors talking about the general practice of the industry, yes. And as well as all the other information that I mentioned, that this is a primary drug for gout. What's their basis for knowing what would happen with doctors in general? Do they say that? Do they say that doctors generally... Yes. Where is that statement? Dr. Morton's declaration, I think it's 2-6, it could be 2-6-5-6. All right. So in paragraph 22, in my experience, in topic 2-6-5-9, in my experience, physicians will not recommend that a patient suffering a gout flare have two very similar colchicine products on hand. Critical concern is treating and relieving patients. And then paragraph 20, because a gout patient will first experience an acute attack and then suffer additional attacks, it is easier for a patient to take a single colchicine product. That's not a statement that he knows what other doctors would do. Yes. Well, I think that the record taking as a whole, and just common sense tells you that, if you've got a treatment that is recommended, the patient is on it, for prophylactics, and you're suffering pain, I think my light is out. Should I stop the question? I didn't even answer the question. That it's natural and inevitable that that will happen. And I don't think it's contrary at all to congressional intent. Because, again, we're dealing with a situation where the label is discussing the use and directing the patient what to do for this use. And the carve-out cases, the other cases we discussed, don't do that. They don't provide any information at all about the other indication. They simply are silent, and I think that's the major difference between these cases. Okay, for the moment. All right, let's hear from the other side. Thank you, and may it please the Court. I would like to start with Mr. Weinberger's concession about theory of inducement being alleged here. He said earlier that he's relying on one statement in the label, consult your doctor, and he said that that is an implicit instruction that induces infringement. Decatur's own case, the AstraZeneca 2010 case, makes it very clear that where a product has substantial non-infringing uses, and Mr. Weinberger conceded that fact before the district court, intent to induce infringement cannot be inferred when the alleged inducer has actual knowledge that some users of its product may be infringing. You need direct evidence. The case goes on to say you need statements or actions directed to promoting infringement. And the court went on, this is their case, to say the pertinent question is whether the proposed label instructs users to perform the penitent method. In their own brief, they answered that question. Page 37, they said HICMA's label does not explicitly instruct users to practice the claim methods. They answered the question that is posed by their very same case in the negative. Their own concessions to the district court about substantial non-infringing uses. Can I just ask you hypothetically, though, because it seems to me what they're turning that consult your doctor language on is that the industry practice and standard protocols and everything is if you're on this drug as a prophylactic means that almost automatically, if you have an acute flare-up, your doctor is going to tell you to use this in a way that would infringe the patent. If that's the case, I know you're going to disagree with that in a minute. Let's assume that's the case, that the only course of treatment for an acute gout flare-up if you're taking this drug prophylactically is to infringe the patent. Would then the consult your doctor phrase be enough for inducement? No, for three reasons. First of all, the 2012 case, the Bayer v. Lupin case, says based on Warner-Lambert and Allergan, the defendant's conduct would constitute inducement of infringement under 271B only if the defendant's andes sought approval for the use protected by the patent. The patent methods, they are off-label uses. We do not have approval for acute flares. For the DDIs, we don't have approval for any drug-drug interaction. That sounds like an argument that no matter what you said on the label, you couldn't be liable. The question, there obviously are some circumstances in which a label would induce infringement. For example, if the label said if you have an acute gout flare-up, you may want to consult your doctor and ask him to prescribe this product. That would be inducement, right? That would certainly get closer, but that would not be in the label unless FDA approved the product for that use, which did not happen here. You're saying that couldn't be on the label, but I'm asking you hypothetically to assume that it is on the label. That would probably be sufficient, right? You're certainly getting much closer to inducement in that circumstance, but there are additional reasons. I think what Judge Hughes was asking you is everybody knows that this is the only treatment the doctors will use when you're already taking the thing for prophylaxis. Some of the other alternatives aren't medically appropriate where you've been taking the generic Colstrain or whatever it's called, for prophylaxis, so that you know that if somebody consults the doctor that sure enough they're going to prescribe the generic. Would that be sufficient? To make sure I understand your hypothetical, the label does say consult your doctor and ask if you can use... No, the label says consult your doctor, but you know that in 100 percent of the cases when the doctor is consulted, he will prescribe the generic that you're already using. That is not enough, because this court in the DSU case, quoting the Supreme Court in Grokster, said very clearly, knowledge of infringement is not enough. After all, the statute... I don't know how to characterize it, but are you saying that even if we know when somebody puts the language consult your doctor on, what they're really saying is by telling them consult your doctor, you know that the doctor is going to prescribe a method that infringes. That's still not enough for inducement? It's not enough. You need affirmative steps, and keep in mind, of course, our label... Why isn't consult your doctor when you know that consulting your doctor is in 100 percent of the cases going to result in infringement inducement? Because there are no affirmative steps, the label, the Midigar label, says the maximum dose is 1.2 milligrams per day. To infringe their acute flare patterns, you need to prescribe 1.8 milligrams in an hour. It's impossible to follow the instructions in the Midigar label and infringe the acute flare patterns. It's impossible. You can't do it. So you have to prescribe the drug off-label. Doctors can prescribe drugs off-label, but if they do, and even if you know that they're going to do it... It seems to me you're staking out a position you don't need to win this case. But could you go back to the factual question here about... Because your friend has pointed to evidence in the declaration of why this is the standard industry practice to do this. Do you have evidence to suggest that there are other ways to treat acute flare-ups for people that are on colchicine prophylactically? I do, Your Honor, and perhaps the best evidence is from the amicus brief filed by the American College of Rheumatology, an organization that Takeda cited to repeatedly in its own brief. And the American College of Rheumatology on page 13 of its brief said that NSAIDs, we're talking about drugs that include Aleve, Motrin, Advil, they have become the treatment choice for most acute attacks of gout. So what happens if a doctor were to look at the label... But that's not in the record, is it? It is in the record. The record for the district court on the preliminary injunction. It seems to me that there's an absence of record on this point. Their doctor advocates don't say that this is standard practice or happens all the time or even almost all the time. And there's no evidence to the contrary anywhere else either. In other words, the record is pretty much silent as to how often it happens that a doctor would take a different dose of the generic. Is that fair? No, there are record sites for two related points. The first point is that the NSAIDs I talked about are alternatives. There are multiple record sites. A384, A93, 384. We're on 384. Okay. Oh, in the box, the last bullet point. The significance and innovations box. That's non-steroidal anti-inflammatory. Of this Coltrane or whatever it is. Coltrane is not a non-steroidal anti-inflammatory, right? That includes over-the-counter medications such as Aleve and Motrin. But it's not Coltrane? It's not Coltrane, no. That's an alternative. You're relying on this last sentence in the box to suggest a treatment for flares? Because it doesn't say anything about that. Okay. If you look at A389, I believe yes. If you look at Table 1, it talks about NSAID therapy there. It may be that the FDA has come up with evidence of what doctors can do with practice here, right? Other than perhaps two doctors who say what they would have done. Well, there is some evidence to that effect. We have submitted declarations saying that the doctors, these are the declarations of that they prescribe Coltracine for acute therapy rarely, less than 5% of the time. And we also have this is important, we have... I suspect the answer is there really isn't. Maybe we're looking for something more specific than is there. But the question seems to be that if somebody has already been assigned Coltracine prophylactically, then is the standard and or only course of treatment for an acute flare-up, once you're taking it prophylactically, Coltracine. There, doctors say that's what they would do. I don't find anything in the record to say that there's any other courses of treatment. But neither side seems to have any definitive proof on that. Well, again, there's the record sites that I just cited suggest and say that the NSAID treatment is an alternative. But all of your record sites, I don't mean to take up too much of your time, they suggest alternative therapies in the first place, not once you're on Coltracine as a prophylactic that the normal course wouldn't be to treat with more Coltracine for a flare-up. I'm not sure if that might be in the declarations of our physicians. I don't know offhand. But I do know that there are record sites for the proposition that these acute flare-ups are exceptionally rare, especially when you're on prophylactic treatment. If you think about it, the purpose of this treatment is to prevent the flare-ups and the record A1512 talks about how in 97% of the case, 97% of patients who have gout, they get a flare-up once every other year. The other 3%, they get a flare-up on average about three times, three and a half times a year. These are very rare, very rare events. So number one, there are alternatives. NSAID, it is their burden to prove at the district court level that the doctor would necessarily take the Coltracine off-label. Of course, our position is even if that were true, it's not enough for you to acknowledge it because you have alternatives. But then, given that these occur very rarely, it ties directly to irreparable harm. An independent basis to affirm here that Mr. Weinberger did not address in his opening presentation. Of course, in order for Takeda to succeed here, it must show abuse of discretion not once but twice, both as to the merits and as to irreparable harm. Do you want to talk about your cross-appeal or leave that on the briefs? Very briefly on the cross-appeal, Your Honor, and I don't want to repeat what's in the briefs. The two quick points is that we obviously needed a cross-appeal to prevent a situation where this court issues a decision affirming. Then the injunction is still in place until the mandate issues, and we ask if the court does affirm to dissolve the injunction immediately. Of course, we ask that the injunction can and should be dissolved even before a decision comes out. Also, that the injunction that is currently in place is causing harm to HCMA in the sense that HCMA did ship product shortly before the TRO was entered, and that product is sitting in warehouses. We understand that at least some of this product is going to be returned in the next couple of weeks if it cannot be sold. If it's returned, it's then destroyed and wasted. Of course, the longer the injunction lasts, the longer patients are harmed, as the American College of Rheumatology pointed out. Thank you, Mr. Kline. Mr. Kline said that acute gout flares were extremely rare in prophylactics. I think that's completely unsupported by the record. For example, at page 3, record 8384, the task force of the American College of Rheumatology said, urate lowering therapy is a cornerstone, that's prophylactics, of management of gout. However, during the initial phase of UOT, there is an increase in acute gout attacks, which has been hypothesized due to remodeling of articular urate crystal deposits, etc. Acute gout attacks attributable to the initiation of UOT may contribute to non-inherence in long-term gout treatment. And then again, as I mentioned earlier, the ACR refers to clinical studies which show substantial rates of acute gout attacks during prophylactics. Mr. Kline also said- What we don't know is how often sales are diverted from you because somebody is taking it for prophylaxis and then has an acute gout attack and it's prescribed to use a different dose of this for the acute gout attack, right? We just don't know how often that happens. Well, right now, it wouldn't be because Cochris is approved for both indications. So it's being used, it's being treated, it's being prescribed for prophylactics. But what would happen? What would happen, right, is that- Well, we don't know. Well, he said it would be prescribed for prophylactics and then they're saying, oh, by the way, if you get an acute flare, consult your doctor. Now, the evidence is clear that this is the same product. It's a capsule. But FDA has said the capsule and the tablet are the same. And it previously said that any 0.6 Colchicine tablet is a duplicate of Cochris. So here's a doctor that was previously using treatment, flares, and now he's substituted Mitigare because it's a generic for Cochris for prophylactics. And are we really going to believe that when the patient calls him up and says, I have a flare, that he's going to say, oh, you know what, I'm going to go send you to CVS and take a few hours to go get another prescription to treat your flare. We're saying the reality of that is that that's not going to happen. Well, that seems to me not much more than lawyer argument because you just don't have any support for what the medical community would do under those circumstances other than a couple of doctors saying that they personally would do that. They're saying this is what would logically and rationally happen. This is the way a rational doctor would act. Well, I don't see even that in there. I think they say that that's what a physician would do under these circumstances. I think it's there in Dr. Morton's declaration. If I could, I'm not sure I have much more I can point the court to on that question. I just want to spend a few seconds on the other patents which we haven't mentioned, which is the Concomitant Administration, the patents that deal with interactions with other inhibitors. And there the instruction in the label clearly says if you have to take Colchicine with these and so they're specifically instructing patients to take Colchicine in a reduced dosage amount. And the only issue is what's the exact dosing? And there the evidence is undisputed that there's only one dosing regimen that's permitted, that's allowed, that's approved by FDA and recognized by the industry and that is the patented dosing regimen. So we don't even get into these other issues about what would a doctor do. So it's very clear that they're instructing people what to do and that that infringes the patent. One other issue I wanted to mention, I think I have a few seconds. Just one point if I may, on the injunction. That is if the injunction turns out to be vacated by this court, there is a provision that we addressed in our brief that we feel is just beyond the court's power which enjoins Takeda from launching an authorized generic for 10 days after the injunction expires. In other words, if the injunction were to be vacated immediately, they would be free to launch an authorized generic of their product, but we would have to wait for 10 days before we could launch one of ours. For the reasons we set forth in our brief, that the wrong standard is being used for status quo, that they already had a head start, that there's no precedent supporting that kind of an injunction, restraint against the moving party after the injunction is vacated, we would ask that that 10 day provision be stricken. Thank you. Do you want a minute to reply to the point about the 10 day delay? Very briefly, the district court here under the Patent Act had very broad discretion to preserve the status quo, quote, on such terms as the court deems reasonable, section 283, very broad discretion, and here it was very reasonable to include the 10 day provision. Well, how do you read the district court's order? If we were to vacate the injunction pending appeal, would the 10 day provision survive? Yes. So that's the dispute. That is the dispute, and then Takeda would have to give notice that they planned to launch an authorized generic and then couldn't do so for 10 business days. That gives the parties time to go back to the district court and litigate whether that injunction on Takeda should be extended or whether a bond should be increased to account for the first mover advantage that HICMA had before the TRO was entered. So the court understands the context here. When the TRO was entered, HICMA was going to, HICMA's generic product was going to be on the shelves the very next day. There is no evidence that Takeda could have had an authorized generic on the market the very next day. It would have taken at least 10 days. Our position is it would have taken them 30 days to get an authorized generic to the market. I think we have the argument. Thank you, Mr. Klein. Thank you, Mr. Weinberger. The case is taken under submission.